IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LAURENE E. HINSON,                      )
                                        )
              Plaintiff,                )        Civil No. 06-515-JO
                                        )
        v.                              )        OPINION AND ORDER
                                        )
COMMISSIONER, SOCIAL SECURITY           )
ADMINISTRATION,                         )
                                        )
              Defendant.                )

        Alan S. Graf
        ALAN STUART GRAF, PC
        P. O. Box 98
        Summertown, TN  38483

          Attorney for Plaintiff

        David M. Blume
        David J. Burdett
        Michael McGaughran
        SOCIAL SECURITY ADMINISTRATION
        Office of the General Counsel
        701 Fifth Avenue, Suite 2900
        M/S 901
        Seattle, WA  98104

        Neil J. Evans

U.S. ATTORNEY'S OFFICE
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902

   Attorneys for Defendant

JONES, Judge:

      Claimant Laurene E. Hinson seeks judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA").  <u>See</u> 42 U.S.C. §§ 401-33, 1381-83f. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Following a careful review of the record, the decision of the Commissioner denying benefits is reversed and remanded for an award of benefits.

<u>ADMINISTRATIVE HISTORY</u>

      Claimant filed an application for DIB on December 4, 2001, alleging an inability to work beginning October 5, 2000.  The application was denied initially and on reconsideration. Claimant requested a hearing, which was held before an Administrative Law Judge ("ALJ") on January 21, 2005.  Claimant, who was represented by counsel, appeared and testified.  A vocational expert ("VE") also testified at the hearing.  On May 27, 2005, the ALJ issued a decision denying the application based on a finding that claimant was not disabled as defined by the SSA.  This decision became final on February 18, 2006, when the Appeals Council declined review.

2 - OPINION AND ORDER

## STANDARD OF REVIEW

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989); Andrews, 53 F.3d at 1039-40.

## SUMMARY OF THE ALJ'S FINDINGS

The ALJ engaged in the five-step "sequential evaluation" process when he evaluated claimant's disability, as required. See 20 C.F.R. § 416.920. First, the ALJ determined that "[t]he claimant [had] not engaged in substantial gainful activity since her alleged onset date" of October 5, 2000. Tr. 17. Second, the ALJ determined that claimant had severe impairments, in the form of "organic mental disorders and disorders of [the] back." Tr. 20. Third, the ALJ concluded that claimant's impairments did not meet or equal the criteria in the Listing of Impairments, Appendix 1, Subpart P, Regulations Part 404. Id. Disorders of the spine are described in Listing 1.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ rejected this as a possible basis for disability because claimant did not suffer from "nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis" as required by the listing. Tr. 20. With regard to the

severity of claimant's mental impairments, the ALJ found that claimant did not satisfy the

requirements of Listings 12.02 (Organic Mental Disorders), 12.03 (Schizophrenic, Paranoid and

Other Psychotic Disorders), 12.04 (Affective Disorders) or 12.06 (Anxiety Related Disorders).

To satisfy any of these listings, claimant must meet either the requirements of sections A and B,

or the requirements of section C.  The ALJ concluded that claimant did not meet either of these

requirements for any listing.

The "A criteria" for Listings 12.02, 12.03, 12.04 and 12.06 represent "medical findings,

which establish the existence of the mental impairment."  Tr. 20.  The ALJ found that claimant

suffers from mental impairments.  The "B criteria" measure the "degree of functional loss

resulting from the documented mental impairment(s)."  Id.  Specifically, the B criteria measure:

"activities of daily living; social functioning; concentration, persistence or pace; and episodes of

decompensation in work or work-like settings."  Id.  As to activities of daily living, the ALJ

noted that claimant's activities included "taking care of her personal needs, helping with

housework, tending to horses, check[ing] email, feed[ing] the dogs, occasionally grocery

shop[ping], pick[ing] up prescriptions and driv[ing] once a week to town . . . ."  Tr. 21.  The ALJ

concluded that claimant suffered only mild limitations on her daily activities.  Id.  As to social

functioning, the ALJ pointed out that claimant was moderately limited when it came to

interacting with coworkers, not creating a distraction or exhibiting behavioral extremes.  He also

noted that she abruptly moved "away from friends and family" following the motor vehicle

accident ("MVA") and that her husband was essentially her only company.  Id.  The ALJ

concluded that these represented only mild limitations.  In terms of concentration, persistence

and pace, the ALJ found claimant to be moderately limited.  Although her basic attention,

memory and cognitive skills were sufficient, they deteriorated as complexity increased, presenting a moderate limitation.  Id.  The ALJ found no evidence of decompensation in work or work-like settings and concluded that claimant's limitation in this area was "none."  Id.  Because the ALJ found claimant's limitations insufficiently severe, she did not satisfy the B criteria.

Claimant can also meet or equal a listing by satisfying its "C criteria."  In general, the C criteria requires a claimant show a medically documented mental disorder resulting in a severe and longstanding limitation on claimant's ability to function outside a highly supportive living environment (among the C criteria for 12.02, 12.03, 12.04 and 12.06 there are slight variations). The ALJ held that claimant did not satisfy any of the C criteria because, for one, the testimony of claimant and her husband lacked credibility and, for another, the conclusions of her treating sources did not support such a finding.  Tr. 23, 24.

Because claimant did not meet or equal any Listing, the ALJ proceeded to Step 4 and determined claimant's residual functional capacity ("RFC").  He concluded that she was capable of light work with certain limitations.  In general, claimant would need to avoid complex tasks, multi-tasking, interacting with others and hazardous situations.  The RFC called for "no more than occasional use of ladders, scaffolds, stooping . . . ."  Tr. 24.  Based on this RFC and her past relevant work, the ALJ found that claimant was unable to perform her past relevant work.  In Step 5, an impartial vocational expert was asked to identify what jobs claimant could perform, based on her RFC.  The VE determined that claimant could work as a marker, a cleaner, or a meter reader.  Tr. 25-26.

To support his finding that claimant was not entirely credible, the ALJ gave the following reasons.  First, the record did not support "claimant's allegations of severe back pain."  Tr. 23.

5 - OPINION AND ORDER

Second, the treating sources did not represent claimant's pain as disabling, nor did they place restrictions on claimant's activities as a result. Id. Third, there was no evidence of a "clinical malformation" or significant pathology that would produce the type of debilitating pain claimant complained of. Id. Fourth, claimant's complaints and her stated lifestyle were at odds. If claimant were as disabled as she claimed, she would not have been able to function in many of the ways she claimed to function in her testimony and as reflected in the record. Finally, "[t]he totality of the evidence, especially the objective and clinical findings of claimant's treating sources, [rebutted] her contentions of disability." Tr. 24.

## STATEMENT OF FACTS

Claimant's difficulties began after she was involved in a serious MVA on June 10, 2000. In the accident, claimant hit her head on the driver's side window. A passenger in the other car was thrown from the car and sustained fatal injuries. Claimant did not see a doctor until two days after the accident, when Dr. Jennifer R. Beverly examined her. At this examination, claimant reported anxiety about the status of the injured passenger, dizziness, flashbacks and a headache in the "left occipital area." Dr. Beverly noted that there was a corresponding contusion in that area. Tr. 181. The report identified claimant's injuries as left cervical muscle strain, postconcussive syndrome, low back pain and left shoulder pain. Tr. 182.

On September 15, 2000, Dr. Scott Bainbridge examined claimant. In a letter to her insurer, American Family Insurance Group ("American Family"), he noted that she was working six hours a day. Tr. 284. A month later, claimant was evaluated by Dr. Gina Navarette, who made a preliminary finding that claimant "appear[ed] to be suffering from post-concussive syndrome." Tr. 222. Dr. Navarette also found that "[claimant's] symptoms of depression and

anxiety are very distressing to her and effectively reducing her coping ability," and cited the need for "neuropsychological evaluation."  Id.

On March 6, 2001, claimant's psychiatrist, Dr. Lawrence Cormier, wrote a letter to American Family.  In this letter, Dr. Cormier diagnosed claimant with "Major Depression, severe single episode without psychotic features," "Encephalopathy, post-concussive," "Pain/Back and Sacroiliac" and "Pain/Pelvis."  Tr. 469.

Claimant was seen by Dr. Navarette in September 2001 "for a comprehensive neuropsychological evaluation in order to document the presence or absence of any acquired brain injury, to assess her current mental capabilities and limitations, and to offer any recommendation for further treatment procedures or strategies, if necessary."  Tr. 195.  This testing had been deferred since October 2000 "due to the patient's significant physical pain and depression."  Id.  In her report dated September 11, 2001, Dr. Navarette stated that claimant exhibited no evidence of malingering during testing.  Tr. 197.  Claimant's test results ranged from average to very poor.  Overall, her performance demonstrated significant cognitive and emotional problems.  In tests measuring academic or intellectual ability, she frequently scored below the 10th percentile: perceptual organization (9th); working memory (7th); sustained visual attention task speed (5th) (this result dropped to below the 1st percentile when asked to increase speed).  Id.  Claimant performed particularly poorly on memory tests, scoring below the 1st percentile on immediate recall, delayed recall, recognition memory of complex figures, and copying complex figures.  Tr. 198.

According to Dr. Navarette, the results of claimant's emotional testing (the MMPI-2 in particular) revealed "significant depression, including feeling hopeless and helpless, low self-

esteem, as well as numerous neurovegetative symptoms." Tr. 198. In addition, the testing

revealed "decreased cognitive functioning" and that claimant's memory deteriorated as

complexity increased. Tr. 199. Testing also revealed problems with visual perception, fine

motor movements, and cognitive problems not based on psychological factors. Dr. Navarette

stated that claimant's cognition might improve. Id. Dr. Navarette reported that a return to work

was not "possible at [that] time due to current cognitive and emotional functioning." Tr. 200.

Dr. Navarette recommended that "when [claimant] attempts to return to work" she should do so

in an environment where distractions are minimized and tasks are broken "into manageable bits

of information to improve memory." Id.

On September 17, 2001, Dr. Bainbridge wrote a letter to American Family regarding

claimant's brain MRI, performed on August 28, 2001. He attributed lesions on the brain near the

occipital lobes to claimant's "history of a significant closed head injury cognitive changes" and

identified them as likely the result of "posttraumatic changes" to the brain. Tr. 271. Also,

Christine Zwart, a cognitive rehabilitation counselor, noted on September 18, 2001 that "MRI

results show damage to [claimant's] visual cortex, impacting fine motor coordination and

attention to visual detail." Tr. 414. On October 2, 2001, Ms. Zwart noted that claimant was

"unable to complete tasks requiring scanning for visual detail" and "reported headaches."

Tr. 194.

Dr. Bainbridge further documented claimant's emotional and physical difficulties in

February and October 2002. "[Claimant] experienced a period of significant depression and

spent three days in bed without eating or drinking last week." Tr. 261. "[Claimant] continues to

deal with the sequela of her thoracic and lumbar strain injuries, closed head injury and

8 - OPINION AND ORDER

depression." Tr. 258. Thomas Politzer, an optometrist, documented claimant's vision problems in a letter on September 17, 2002. He concluded that claimant was experiencing a "reduction in stereopsis" (loss of depth perception) and sensitivity to light, but that these problems "should resolve with approximately 10 to 12 visits." Tr. 253.

In February 2002, Dr. Peter LeBray evaluated claimant at the request of American Family. Dr. LeBray reviewed the record and examined claimant. He concluded that she suffered from "severe depression with some anxiety and somatization" and was "quite hopeless, [felt] little support, and [was] extremely low in terms of energy, mood and motivation," which he attributed to "an episode of major depressive disorder." Tr. 432. He also observed that claimant's "overall mood in some ways did not appear as severe as endorsed" and that "[c]urrent findings are not reflective of minor traumatic brain injury or even post-concussion syndrome." Tr. 428, 430. Dr. LeBray speculated that claimant's cognitive problems could be a result of medication or depression and pointed out that "litigation and/or secondary gain are often factors which can complicate recovery adding to major depression." Tr. 430, 436. Dr. LeBray assigned to claimant a Global Assessment of Functioning ("GAF") score of 45. Tr. 434.

In a report to the Oregon Department of Human Services in March 2003, Dr. Cormier described his impressions of claimant. He noted claimant's decreased auditory and reading comprehension, the weakness of her short term memory and low task completion rate. Tr. 307. He pointed out that claimant "[c]an be quite persistent yet [her] very low efficiency lends itself to high levels of frustration, manifested behaviorally, which is not conducive to positive work relations." Id. With regard to claimant's social interaction, Dr. Cormier characterized claimant as "easily frustrated and angered," as well as impulsive. Tr. 308. Claimant's "[m]otivation to be

agreeable and successful is too often overridden by fear and low frustration tolerance.  [This] [a]pplies to both her approach to people and to situations." Id.  In October 2003, Dr. Cormier diagnosed claimant with Post-Traumatic Stress Disorder and Major Depression, severe.  He concluded that claimant was "[u]nable to keep a job."  Tr. 460.

Dr. Brennan evaluated claimant between October 2003 and February 2004.  He diagnosed claimant with a depressive disorder, cognitive disorder and post-traumatic stress symptoms.  Tr. 446.  Claimant reported waking between 1 a.m. and 4 a.m. each morning, persistent feelings of guilt due to the MVA fatality and ongoing suicidal ideation.  Tr. 453, 456, 458.  As to claimant's ability to work, Dr. Brennan asserted that claimant's "symptoms were severe enough during that time frame to prevent her from engaging in meaningful employment."  Tr. 446.  After the MVA, claimant went back to work, but found that it was too difficult, emotionally and physically.  Tr. 458.  Dr. Brennan summarized his impressions of claimant's ability to work:  "[T]his woman has a history prior to her accident of many years of self-directed and demanding employment.  Her inability to establish employment during the time I was seeing her seemed to be very upsetting for her and not something she preferred.  I believe she felt there was nothing to be gained by not working and that she would have worked if she could."  Tr. 446.  More generally, Dr. Brennan observed that claimant "insists that she is very tired of living like this and she wants to live life again."  Tr. 454.  In addition, Dr. Brennan expressed his belief that claimant's "difficulties are more neurologically based and that she will have to learn how to adapt to these deficits rather than trying to recover fully . . . ."  Tr. 448;  see also Tr. 450.

Yet another practitioner, Margaret Hansen, LCSW, assessed claimant's condition as "[d]epression, likely PTSD, possible dementia due to head injury . . . ."  Tr. 474.  Nancy Hiatt, a

doctor of psychology, evaluated claimant from March to December 2004 after being referred by

Dr. Brennan.  Dr. Hiatt observed that "claimant has better cognitive skills than she gives herself

credit [for]."  Tr. 520.  Even so, Dr. Hiatt rated claimant's GAF at 40.  On a final note, on

September 10, 2004, Dr. Brennan noted that he and Ms. Hansen agreed that claimant probably

did not suffer from PTSD.  Tr. 528.

## DISCUSSION

Claimant challenges the ALJ's decision on three grounds:  (1) the ALJ rejected claimant's

testimony based on lack of credibility, but did not give sufficient reasons for doing so, (2) the

ALJ failed to give clear and convincing reasons for rejecting the opinions of treating and

examining physicians, and (3) the ALJ presented a hypothetical question to the VE that was not

supported by the record.  Claimant requests that this court reverse the decision of the ALJ and

remand her case for an award of benefits.

## 1.     Claimant Credibility

When evaluating claimant credibility, the ALJ is permitted to use "ordinary techniques of

credibility evaluation" when weighing the value of claimant's testimony.  Bunnell v. Sullivan,

947 F.2d 341, 346 (9th Cir. 1991) (quoting Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989).

However, "[f]or the ALJ to reject the claimant's complaints, [the ALJ] must provide specific,

cogent reasons for the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (internal

citation and quotation marks omitted).  Further, "the ALJ must identify what testimony is not

credible and what evidence undermines the claimant's complaints."  Id.  Where "claimant

produces medical evidence of an underlying impairment, the [ALJ] may not discredit the

claimant's testimony as to the severity of symptoms merely because they are unsupported by

objective medical evidence." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Bunnell, 947 F.3d at 343). In fact, "[u]nless there is affirmative evidence showing that the claimant is malingering, the [ALJ's] reasons for rejecting the claimant's testimony must be clear and convincing." Lester, 81 F.3d at 834 (internal quotation marks omitted).

Here, the ALJ rejected much of claimant's testimony and found that the claimant's "credibility [was] limited to the extent it comports with the [RFC]." Tr. 23. In other words, the RFC reflects the elements of claimant's testimony that the ALJ deemed credible. In essence, the ALJ gave two reasons to reject the claimant's complaints and assertions. First, the ALJ concluded that "[t]he totality of the evidence fails to document any significant pathology capable of producing severe and debilitating pain, as the claimant has alleged." Tr. 24. He stated that "[n]either the objective medical evidence nor the testimony of the claimant establishes that the ability to function has been so severely impaired as to preclude all types of work activity." Id. Second, the "claimant's statements concerning her impairment(s) and [their] impact on her ability to work are not entirely credible in light of the claimant's own description of her activities and life style . . . and the reports of the treating and examining practitioners." Id.

Claimant concedes that the ALJ "gave extensive reasons for rejecting [claimant's] complaints of physical pain." Pl. Opening Br. 13. Even so, she contends that the ALJ did not sufficiently support his decision to disregard the mental limitations of claimant, nor the combination of mental and physical limitations giving rise to her alleged disability. "[T]he Commissioner is required to take into account the combined effect of a claimant's physical and mental impairments in determining whether his condition equals [a] listing." Lester, 81 F.3d at 828. The ALJ cited the record as a whole, claimant's testimony and the reports of treating

12 - OPINION AND ORDER

practitioners and declared them generally inconsistent.  I agree with claimant that the ALJ's reasoning was insufficient to justify rejecting claimant's testimony because it merely expressed a conclusion, rather than identifying testimony that was not credible or specific evidence that undermined it.

Where a claimant is not affirmatively shown to be malingering, the ALJ's reasons for disregarding her testimony must be clear and convincing.  Here, there is no evidence that claimant is malingering.  According to Dr. Navarette, she put forth a full effort during the series of neuropsychological tests administered in July and August 2001.  Tr. 197.  Dr. Brennan remarked on claimant's frustration that she could not work and noted that claimant "felt there was nothing to be gained by not working and that she would have worked if she could."  Tr. 446. In fact, claimant attempted to return to work after the MVA, but was forced to stop working because of mental and physical impairments.  Tr. 458.  That the claimant has attempted, with some success over the course of four years, to occasionally engage in pre-accident activities does not negate the existence of underlying impairments or her claim of disability.  "Several courts, including [the Ninth Circuit], have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."  Reddick, 157 F.3d at 722.  In fact, a claimant need not be totally incapacitated to be disabled for purposes of SSI.  The Ninth Circuit has recognized that "many home activities are not easily transferable to what may be the more grueling environment of the workplace . . . ."  Fair, 885 F.2d at 603.  Though claimant did attempt to engage in normal activities, like riding her horse and doing yoga, the entirety of the record demonstrates that her ability to engage in these activities was limited, and often entirely foreclosed, by her impairments.

13 - OPINION AND ORDER

As to the RFC determination, "Social Security regulations define [RFC] as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."" Reddick, 157 F.3d at 724 (emphasis omitted) (quoting 20 C.F.R. 404, Subpt. P, App. 2, § 200.00(c)). An RFC is meant to express an individual's ability to work in a sustained fashion. Therefore, the ability to engage in an activity *occasionally* does not translate into an individual's capacity for sustained performance of that activity, for purposes of an RFC. In fact, "occasional symptom-free periods–and even the sporadic ability to work–are not inconsistent with disability." Reddick, 157 F.3d at 724 (quoting Lester, 81 F.3d at 833).

Here, the ALJ asserted that claimant's daily activities were inconsistent with her claimed inability to work. However, the ALJ failed to specifically illustrate these inconsistencies. In formulating claimant's RFC, the ALJ ignored the bulk of the evidence, namely claimant's testimony about her limitations and the conclusions of her treating and examining physicians. For example, claimant testified that she has difficulty sitting or standing for sustained periods of time (i.e., more than one hour). Tr. 558. She also stated that carrying groceries can incapacitate her for days afterward. Tr. 557. Her testimony speaks to general difficulties with depression, low dexterity, inability to keep house, pay bills, or function normally. Tr. 551, 552, 558, 557. She also testified that she experiences constant pain in her back. Tr. 551. Claimant stated that her depression was totally debilitating, on average, four or five days a month. Tr. 552. These limitations are not reflected in claimant's RFC, nor did the ALJ give sufficient reasons to reject claimant's testimony on these issues as not credible.

In sum, the ALJ failed to give clear and convincing reasons for his decision.  Pointing to the record as a whole as generally inconsistent with the testimony and deeming claimant "not entirely credible" is an insufficient basis to reject this claim.

**2.    Physicians' Opinions**

Claimant also argues that the ALJ did not give sufficient reasons to reject the opinions of her treating and examining physicians.  Pl. Opening Br. 5.  The opinions of a treating physician are given more weight than those of non-treating physicians.  Reddick, 157 F.3d at 725.  The uncontradicted opinion of a treating or examining physician can only be rejected for "clear and convincing reasons supported by substantial evidence in the record."  Id.  (internal citation and quotation marks omitted).  Even where the opinion is contradicted, "the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record."  Id.  (internal quotation marks and citations omitted).  Here, the ALJ ignored key diagnoses by five different treating sources, gave insufficient reasons for doing so, and failed to consider the record as a whole.

Claimant's treating and examining physicians expressed their conclusions as to her ability to sustain employment.  In 2001, Dr. Navarette stated that a return to work was not possible at that time.  Tr. 200.  Dr. Bainbridge said that claimant spent three days in bed due to depression.  Tr. 261.  Dr. Cormier cited weak memory, comprehension, task completion, all of which led to frustration and poor work relations.  Tr. 307.  Dr. LeBray assessed her GAF at 45 indicating major impairment in functioning.  Tr. 434.  Dr. Brennan stated that claimant would work if she could.  Tr. 446.  The treating sources are in agreement, at least implicitly, that claimant is unable

to work.  Therefore, the ALJ can only reject these conclusions based on clear and convincing reasons supported by substantial evidence in the record.

In her 2001 evaluation, Dr. Navarette stated that "[w]hen [claimant] attempts returning to work" she should do so in an environment that minimizes distractions and breaks up tasks into manageable pieces.  Tr. 200.  The ALJ cited this evaluation, but failed to mention Dr. Navarette's conclusion that claimant could not return to work.  In addition, the ALJ highlighted Dr. Navarette's recommendation as to "when the claimant returned to work," rather than when claimant *attempted* to return to work.  Tr. 18.  The omission insinuated that Dr. Navarette felt that claimant *would* be able to work in the future when, in fact, she felt that claimant *might* be able to work in the future.  This practice, "[developing an] evidentiary basis by not fully accounting for the context of materials of all parts of the testimony and reports," is rejected by the Ninth Circuit.  Reddick, 157 F.3d at 723.

In October 2003, Dr. Cormier described claimant as "unable to keep a job."  In October 2004, he listed claimant's symptoms as anxiety, depression, helplessness, impaired reasoning and poor concentration.  He rated each symptom as four on a scale of five.  Claimant asserts that the ALJ committed legal error in failing to take the clinical impressions of Dr. Cormier into account.  Pl. Opening Br. 11.  The ALJ did not mention these diagnoses nor discuss how the claimant could work in spite of the stated impairments.

Dr. Brennan saw claimant eleven times between October 2003 and June 2004.  He concluded "that the claimant's signs and symptoms during that time were severe enough to have prevented her from employment."  Tr. 19.  The ALJ rejected this conclusion because Dr. Brennan did not perform "objective clinical testing" on claimant.  Id.  As claimant argues, that

16 - OPINION AND ORDER

Dr. Brennan did not perform objective tests should not undermine his conclusions because they were not at odds with other treating sources who did perform objective testing.  Pl. Opening Br. 12.  In the absence of evidence to the contrary, this court may assume that Dr. Brennan's subjective impressions are accurate and credible.  See Lester, 81 F.3d at 823-833 ("The Commissioner is required to give weight not only to the treating physician's clinical findings and interpretation of test results, but also to his subjective judgments.").  Dr. Brennan's observations are helpful in assessing the subjective elements of claimant's condition.  He observed that claimant is unhappy that she is unable to work and wishes she could return to her pre-accident condition.  Tr. 446.  Dr. Brennan also stated that claimant is tired of living in her present condition and "wants to live life again."  Tr. 454.  He concluded that claimant's problems are probably neurological and she will therefore need to learn to adapt, rather than recover.  Tr. 448.

Claimant argues that the ALJ improperly ignored the GAF scores assigned to her by three practitioners.  In 2004, Dr. Hiatt assessed claimant's GAF score at 40.  In 2003, Dr. LeBray scored her at 45 and Dr. Cormier scored her at 50.  According to the DSM-IV-TR, a score in the 31-40 range indicates "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood."  DSM-IV-TR, Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, American Psychiatric Association, Washington D.C., 2000.  Scores in the 41-50 range indicate "serious impairment in social, occupational or school functioning."  Id.  Although these scores do not establish disability as a matter of law, they are indicative of a general level of functioning.  See Morgan v. Commissioner, 169 F.3d 595, 598 n.1 (9th Cir. 1999) ("Clinicians use a GAF to rate the psychological, social and occupational functioning of a patient.").  In the three instances where claimant's GAF scores

17 - OPINION AND ORDER

were reported, claimant was assessed as seriously or, most recently, majorly impaired in generalized functioning.

As he did with his credibility findings, the ALJ also failed to provide clear and convincing evidence to reject these medical opinions. "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." Embrey, 849 F.2d at 421-22. Here, the physicians' reports provide overwhelming support for the conclusion that claimant is disabled. The ALJ concluded the opposite. "Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's, it is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings." Id. at 422. The ALJ failed to meet this burden.

3.    **The ALJ's Hypothetical Question**

Claimant's final claim is also valid. "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value." Id. (quoting Gallant v. Heckler, 753 F.2d 525, 527 (9th Cir. 1984)). Because claimant's testimony was improperly rejected and is, in this case, credited as true, the ALJ's hypothetical, as presented to the VE, is not supported by the record. The ALJ stated that claimant could perform a "significant range of light work." Tr. 25. This includes jobs that "require[] a good deal of walking or standing," involve "lifting and carrying more than 10 pounds frequently with an occasion[al] 20 pound maximum," and "occasionally ladder climbing, scaffold use, stooping." Tr. 568. In the hypothetical, the claimant would be permitted to sit down for five minutes or less every hour. Tr. 570. The VE indicates that one of the jobs, the

hotel maid, would possibly allow the claimant to take a five minute break every two hours of an

eight hour work day.  Id.  In general, the jobs identified by the VE would not tolerate more than

one absence per month, if any.  Tr. 571.  The VE also stated that a hypothetical claimant

requiring a two hour break each day would be precluded from performing unskilled work

(except, perhaps, working a swing shift).  Tr. 575.  The ALJ's hypothetical ignored several

important attributes of claimant's impairments: her inability to sit or stand for long periods of

time, the four or five days a month claimant is incapacitated with depression, claimant's inability

to carry groceries without severe physical repercussions, her inability to walk more than a

quarter of a mile.  Tr. 551, 552, 557.  Her husband also testified that she cannot sit or stand in

one position, cannot sleep, has trouble with cognition, has an unreliable memory and cannot

perform physical labor or she will "pay for it the next day."  Tr. 563-565.  The ALJ's

hypothetical did not reflect these considerations, therefore, the VE's testimony has no evidentiary

value.

**3.**     **Remand for Benefits/Further Proceedings**

This court "[has] discretion to remand a case either for additional evidence and findings

or to award benefits."  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  A remand for

benefits is proper where the following three requirements are met: "(1) the ALJ has failed to

provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues

that must be resolved before a determination of disability can be made, and (3) it is clear from

the record that the ALJ would be required to find the claimant disabled were such evidence

credited."  Id.

19 - OPINION AND ORDER

Here, the ALJ did not give legally sufficient reasons to reject the claimant's or her husband's testimony as not credible. He also failed to justify ignoring the diagnoses of several treating practitioners who declared claimant incapable of working and recognized the severity of her mental impairments. In addition, the ALJ presented the VE with a hypothetical that was unsupported by the record as a whole.

Second, the record is complete and requires nothing further to make a disability determination. It contains the reports of nine treating and examining physicians, all of whom agreed that claimant suffered severe mental impairments and three of whom explicitly concluded that claimant was incapable of working. Because the ALJ did not give sufficient reasons to reject these opinions, this court credits these findings as true. The record also reflects the testimony of claimant and lay witnesses as to the severity of her symptoms. Again, the ALJ failed to give legally sufficient reasons to reject this testimony. The record does not suggest that claimant is malingering and the ALJ failed to provide the clear and convincing reasons needed to reject claimant's testimony.

Finally, when the evidence that was improperly rejected by the ALJ is credited as true, the Commissioner did not meet the burden of identifying other jobs existing in substantial numbers in the national economy that claimant can perform. Therefore, for purposes of the SSA, claimant is disabled.

## CONCLUSION

For the reasons stated, the decision of the Commissioner denying benefits is reversed and remanded for an award of benefits under sentence four of 42 U.S.C. § 405(g).

DATED this 19th day of June, 2007.

 /s/ Robert E. Jones                              
ROBERT E. JONES
U.S. District Judge

21 - OPINION AND ORDER